# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TIMOTHY A. FROST, | ) | CASE NO. 1:18CV1947 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Timothy A. Frost, ("Plaintiff" or "Frost"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his application for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and the case REMANDED

for further consideration consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

1

## I.   PROCEDURAL HISTORY

In March 2015, Frost filed an application for POD and DIB, alleging a disability onset date of June 2, 2014 and claiming he was disabled due to post-traumatic stress disorder ("PTSD"), general anxiety disorder, depression, idiopathic hypersomnia, and attention deficit disorder ("ADD").  (Transcript ("Tr.") 13, 218.)  The applications were denied initially and upon reconsideration, and Frost requested a hearing before an administrative law judge ("ALJ").  (Tr. 13.)

On May 9, 2017, an ALJ held a hearing, during which Frost, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 34-78.)  On October 18, 2017, the ALJ issued a written decision finding Frost was not disabled.  (Tr. 13-33.)  The ALJ's decision became final on July 16, 2018, when the Appeals Council declined further review.  (Tr. 3-7.)

On August 24, 2018, Frost filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 13, 14.)  Frost asserts the following assignments of error:

> (1)    The ALJ violated the treating physician rule with respect to the opinions of treating psychiatrist Dr. Turell and treating psychologist Dr. Wolf.
>
> (2)    The ALJ did not properly consider the opinions of State agency psychological consultants Dr. Hoyle and Dr. Waggoner.

(Doc. No. 11.)

## II.   EVIDENCE

### A.    Personal and Vocational Evidence

Frost was born in May 1959 and was fifty-eight (58) years-old at the time of his administrative hearing, making him a person of advanced age under social security regulations.

2

(Tr. 24.) *See* 20 C.F.R. §§ 404.1563 & 416.963. He has at least a high school education and is able to communicate in English. (*Id.*) He has past relevant work as a cable technician (light performed as heavy, skilled, SVP 7) and food clerk (light, semiskilled, SVP 3). (Tr. 23.)

**B.      Relevant Medical Evidence[2]**

At the outset, the Court notes that, aside from citing the medical opinions in this case, Frost's Brief on the Merits fails to cite or discuss *any* of the medical evidence in this matter with regard to either his physical or mental impairments. (Doc. No. 11.) This is in direct violation of this Court's Initial Order, which provides (in relevant part) as follows:

> Plaintiff's brief shall first set forth a list of "Legal Issues," followed by a recitation of "Facts" in a "Facts" section, and then an "Argument" or "Analysis" section. * * * **The parties are expected to fully and fairly present to the Court all relevant evidence in the record, both favorable and unfavorable. A full recitation of all relevant evidence should be presented. * * * Any facts recited in support of the "Argument" or "Analysis" section of the brief must also be set forth in the "Facts" section of the brief. Any factual allegations or arguments relying upon the record that either do not cite to the record or are unsupported by the record citation will not be considered by the Court.**

(Doc. No. 5 at 3-4) (emphasis in original). Despite the above, Frost fails entirely to discuss any of the underlying medical evidence contained in the lengthy administrative record in this case.[3]

Frost's failure to do so not only violates this Court's Order, but makes the Court's review unnecessarily more difficult. The undersigned takes great care in reviewing and reciting the facts in social security cases, and demands the parties to do the same. While it is recommended the

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] The administrative record in this matter is 2,150 pages long. (Doc. No. 9.) At a bare minimum, Frost should have discussed and cited the treatment records of Drs. Turell and Wolf, both of whose medical opinions are directly at issue in this matter. His failure to do is regrettable.

Court grant Frost's request that this matter be vacated and remanded, this should not be taken in any way as excusing Frost's failure to follow this Court's briefing requirements.  To the contrary, the Court is very troubled by counsel's failure to satisfy his obligations under this Court's Order, particularly in light of the lengthy and complicated medical record in the instant action.

With that being said, the Court will now discuss the medical evidence cited by the Commissioner in this matter.  On January 11, 2012, Frost underwent a neuropsychological evaluation with psychologist Thomas Swales, Ph.D., for evaluation of his complaints of "attentional difficulties, compounding a longstanding history of anxiety."  (Tr. 443.)  After thorough examination and testing, Dr. Swales assessed generalized anxiety disorder; major depressive disorder, recurrent, mild; and personality disorder, not otherwise specified, with passive-aggressive personality traits.  (*Id*.)  He concluded Frost's neuropsychological evaluation was within normal limits, and indicated his "attentional complaints are most likely a component of his anxiety."  (Tr. 446.)  Dr. Swales found Frost would benefit from ongoing participation in individual psychotherapy and a trial of antidepressants.  (*Id*.)

Six months later, on June 28, 2012, Frost presented to licensed social worker Donald Caserta, M.A., MSSA, LISW-S, for an ADHD diagnostic evaluation.  (Tr. 448-450.)  Mr. Caserta concluded Frost's symptoms were "subsyndromal for ADHD," and noted his "presenting symptoms are better accounted for by other mental disorders and recent environmental stressors." (Tr. 449.)  He diagnosed major depressive disorder, recurrent, mild; post-traumatic stress disorder; and adjustment disorder with anxiety; and assessed a Global Assessment of Functioning

4

("GAF") of 41 to 50,[4] indicating serious symptoms.[5]  (Tr. 449.)

On November 10, 2013, Frost presented to the Emergency Room ("ER") with suicidal thoughts.  (Tr. 391-393.)  He stated he felt incapacitated by his chronic hypersomnia, which had only recently been diagnosed.  (Tr. 391.)  Mental status examination findings were normal, including calm, cooperative, friendly appearance and attitude; euthymic mood; normal speech; logical and organized thought form and content; sustained memory and attention; and good judgment and insight.  (Tr. 392.)  The ER physician diagnosed mood disorder, and assessed a GAF of 71 to 80, indicating "transient symptoms reactive to stressors."  (Tr. 393.)  Frost was discharged with instructions to follow up with outpatient psychiatry.  (*Id*.)

Two days later, Frost presented to Thomas Murphy, M.D., for follow-up of "severe lifelong gender dysphoria therapy."[6]  (Tr. 389-391.)  He complained of tiredness, though his thyroid levels were normal.  (Tr. 390.)  Dr. Murphy assessed gender dysphoria, and hypothyroidism.  (*Id*.)  With regard to the latter, he found Frost was "clinically and chemically euthyroid[7] with less fatigue" with medication.  (*Id*.)

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

[5] Several pages of this report appear to be missing from the record.

[6] The record reflects Frost transitioned from female to male in the 1990's, when he was 35 years old.  (Tr. 1327, 1610, 1938.)

[7] The term "euthyroid" refers to the state of having normal thyroid gland function.

5

On April 8, 2014, Frost presented to Marc Winkelman, M.D., with complaints that it was taking him a long time to "process things" at school.  (Tr. 382-385.)  He also stated his "nerves were shot" and he was unable to complete his school's respiratory therapist program.  (Tr. 382.)  Dr. Winkelman found Frost had normal mini-mental status and neurological examinations, and expressed doubt that he had a neurologic disorder.  (Tr. 385.)  Rather, he believed Frost's cognitive symptoms were probably due to his anxiety.  (*Id*.)  He ordered an MRI of Frost's head, and an EEG.[8]  (*Id*.)

On October 9, 2014, Frost presented to Ewald Horwath, M.D., with complaints of increased psychiatric symptoms stemming from a difficult conversation with a Rabbi which resulted in him being "expelled" from a conservative synagogue.  (Tr. 610-612.)  Several pages of this treatment record are missing, including pages containing mental status examination findings.  However, it appears Dr. Horwath diagnosed PTSD and depressive disorder; assessed a GAF of 51 to 60, indicating moderate symptoms; and prescribed Sertraline (also known as Zoloft).  (Tr. 612.)

Meanwhile, the record reflects Frost presented to psychologist Abraham Wolf, Ph.D., on twenty-four (24) occasions between June and December 2014.  (Tr. 744-767.)  In June, Frost complained of difficulty sleeping and concentrating.  (Tr. 745.)  In July, he felt "demoralized about his life" and acknowledged his "strong dependency needs."  (Tr. 746.)  Later that month, he brought a stuffed animal to his session for comfort and felt less depressed and anxious.  (Tr.

---

[8] Neither party directs this Court's attention to any medical records indicating Frost underwent these tests and, if so, what the results were.  The Commissioner does note that Frost underwent a sleep study in August 2014, which revealed obstructive sleep apnea.  (Tr. 471-473.)

6

747.)  At one of his sessions, Frost raised several examples from school, work, family and friends of "how he has been treated unjustly."  (Tr. 750.)  On several occasions, he described conflicts with others, including friends, teachers, a tutor, therapists, a Rabbi, and Dr. Wolf himself.  (Tr. 749, 754, 756, 759, 765.)  In September, Frost admitted to suicidal ideation.  (Tr. 756.)  Later that month, Dr. Wolf "actively confronted him with how he expects the world to accommodate his needs," and focused on the issue of immaturity.  (Tr. 757, 758.)  Frost continued to report occasional suicidal thoughts in October.  (Tr. 760, 761.)  During this time period, he participated in group therapy and art therapy.  (Tr. 760.)  He appeared less depressed and anxious in November; however, he reported a fear of leaving his house due to anxiety.  (Tr. 763, 764.)  In December, Frost reported Dr. Horwath had increased his Zoloft dosage, which resulted in an improvement in his mood.  (Tr. 765.)  Dr. Wolf found Frost "continue[d] to have difficulties understanding social cues even when they are explicitly stated."  (Tr. 766.)  Later that month, Frost joined a emotions anonymous group.  (Tr. 767.)

Frost continued to see Dr. Wolf regularly in 2015.  (Tr. 768-781, 1193-1213.)  In January, he complained of continued sleeping problems.  (Tr. 768.)  Later that month, Frost "admitted to strong needs for attention and affection related to feelings of deprivation."  (Tr. 769.)  Dr. Wolf reminded him to focus on the fact that "the world will not accommodate to him."  (Tr. 770.)  In late January and February, Frost reported dropping out of several classes and the phlebotomy program, and feeling demoralized.  (Tr. 771, 772, 774.)  In March, he repeatedly emailed Dr. Wolf with complaints of feeling overwhelmed and depressed.  (Tr. 776.)  He described a feeling of mental paralysis "where he is unable to cope with levels of stress that in the past he had been able to deal with."  (*Id.*)  Later that month, he reported he had been diagnosed with ADD and

expressed resentment that this was not diagnosed earlier. (Tr. 777.) In late March, Dr. Wolf

explained that he was going on medical leave, and Frost would need to temporarily transition his

care to another psychologist. Frost was initially very anxious about this transition, but then

appeared to accept it. (Tr. 777, 778, 779, 781.) On May 12, 2015, however, Dr. Wolf noted

Frost was "very angry that I [had] not responded to his repeated emails during my medical leave"

and had requested to be transferred to a different provider.[9] (Tr. 1213.)

On May 13, 2015, Frost presented to the ER with complaints of worsening depression.

(Tr. 868-869.) He reported he was unable to eat or sleep, and indicated that "if he had a gun he

would shoot himself." (*Id.*) On examination, Frost had "somewhat of a bizarre affect" with poor

eye contact, and was emotionally labile and "significantly depressed." (*Id.*) The ER physician

felt that "risk factors are high" and admitted him for psychiatric treatment. (*Id.*) The record

reflects Frost was discharged five days later, on May 18, 2015, after being treated with

medication. (Tr. 924-926.)

In June and July 2015, Frost presented to psychologist Antonio Feo, Ph.D. (Tr. 1309,

1085-1089.) He generally reported feeling angry, frustrated, lonely and defenseless. (*Id.*)

Mental status examination findings were largely normal, including normal thought

process/orientation and normal behavior. (*Id.*)

---

[9] Frost also presented regularly to psychiatrist Robert Weiss, M.D., during this time
period. (Tr. 818, 1273-1278.) Dr. Weiss' treatment notes are handwritten and difficult to
decipher. However, he appears to have diagnosed ADD and prescribed Adderall in
February 2015. (Tr. 818.) At that time, Dr. Weiss noted Frost suffered from "massive
arrested development." (Tr. 818.) In July 2015, he found Frost had poor judgment and
"atypical immaturity," noting it was "unclear where to go" in terms of therapy. (Tr.
1277.) In August, Dr. Weiss noted Frost was "classic bipolar" and "very preoccupied,
narcissistic." (Tr. 1276.) The following month, he noted the presence of suicidal
thoughts. (Tr. 1274.)

On July 20, 2015, Frost presented to the ER with complaints of dizziness, weakness, lightheadedness, nausea, and vomiting.  (Tr. 1094-1096.)  He was diagnosed with adrenal insufficiency, and prescribed Hydrocortisone and Florinef.  (Tr. 1138.)  Shortly thereafter, on July 28, 2015, Frost returned to Dr. Murphy, who confirmed a diagnosis of primary adrenal insufficiency ("almost certainly autoimmune") and continued Frost on his medications.  (*Id*.)  The following month, Dr. Murphy found Frost's adrenal insufficiency was "well-compensated" on medication.  (Tr. 1152.)  He also determined Frost was "clinically and chemically euthryoid with less fatigue."  (*Id*.)  Dr. Murphy reached the same conclusions in November 2015.  (Tr. 1988-1991.)

Meanwhile, Frost re-established treatment with Dr. Wolf and saw him on sixteen (16) occasions between July and December 2015.  (Tr. 1193-1212.)  On July 24, 2015, Dr. Wolf noted Frost had been diagnosed with "Addison's disease, adrenal insufficiency," and indicated "this diagnosis may be related to mental status changes [that] he has been trying to understand."  (Tr. 1207.)  While Frost's mood varied, he reported feeling less depressed and anxious in September 2015.  (Tr. 1203.)  Dr. Wolf noted Frost was volunteering and taking dance lessons, and looking for jobs.  (*Id*.)  On October 14, 2015, Dr. Wolf diagnosed major depressive disorder, recurrent, moderate; and generalized anxiety disorder.  (Tr. 1200.)  The following week, Frost reported feeling "fuzzed," which he described as follows: "When I wake up I know where I am but my mind does not know where I am.  My mind and my body are in two different places.  My mind is just not connected.  Only later in the day do I feel connected. I don't know what's causing that."  (Tr. 1198.)  The following month, Frost was more depressed and showed a loose stream of thought "with associations that he cannot explain and expects me [i.e., Dr. Wolf] to interpret."

9

(Tr. 1195.)

On October 26, 2015, Frost underwent another neuropsychological evaluation with Dr. Swales.  (Tr. 1793-1800.)  Dr. Swales diagnosed generalized anxiety disorder; major depressive disorder, recurrent, moderate; and personality disorder, not otherwise specified, with passive-aggressive personality traits.  (Tr. 1793.)  He again found the results of Frost's evaluation were within normal limits.  (*Id*.)  On examination, Dr. Swales noted Frost was alert, attentive, and friendly, with normal speech, a pleasant affect, and balanced mood.  (Tr. 1797.)  His overall intellectual abilities were in the average range, with a Full Scale IQ of 108.  (*Id*.)  However, Dr. Swales also noted as follows:

> His clinical profile . . . suggests a person with significant thinking and concentration problems, accompanied by prominent distress and dysphoria.  [Frost] is likely to be quite withdrawn and isolated, feeling estranged from the people around him. His current difficulties have probably placed strain on a few close interpersonal relationships that he does have.  He probably sees little hope that his circumstances will improve to any significant degree, and his hopelessness and pessimism, combined with the likelihood of impaired judgement, might place him at increased risk for self-harm.  [Frost] reports a number of difficulties consistent with a significant depressive experience. He is likely to be plagued by thoughts of worthlessness, hopelessness, and personal failure.  He admits openly to feelings of sadness, a loss of interest in normal activities, and a loss of sense of pleasure in things that were previously enjoyed.  He is likely to show a disturbance of sleep pattern, decrease in a level of energy and sexual interest, and loss of appetite and/or weight.  Psychomotor slowing might also be expected.  He is likely to be a socially isolated individual who has few interpersonal relationships that could be described as close and warm. He may have limited social skills, with particular difficulty interpreting the normal nuances of interpersonal behavior that provide the meaning to personal relationships.  His social isolation and detachment may serve to decrease a sense of discomfort that interpersonal contact fosters.  His thought processes are likely to be marked by confusion, distractibility, and difficulty concentration, and he may experience his thoughts as being somewhat blocked or disrupted. . . . He may be prone to behaviors which are self-harmful or self-destructive with little forethought as to the potential consequences of these behaviors.

(Tr. 1798.)  Dr. Swales recommended individual psychotherapy, outpatient psychiatric treatment,

10

and vocational training.  (Tr. 1800.)  He also noted that "[i]n light of the chronic nature of his adjustment difficulties, Mr. Frost may, in fact, be permanently and totally disabled as a consequence of his major depressive disorder and generalized anxiety disorder."  (*Id*.)

In 2016, as a result of both a change in insurance and his dissatisfaction with treatment, Frost presented to a number of different providers for evaluation of his mental health symptoms. On January 12, 2016, he presented to primary care physician James Hekman, M.D., with complaints of fatigue and difficulty focusing.  (Tr. 1687-1693.)  He reported he had applied for a "few jobs" but noted he had "a difficult time with focus to get cover letters and resumes together."  (Tr. 1687.)  On examination, he was alert, cooperative, pleasant, and in no acute distress.  (Tr. 1690.)  Dr. Hekman assessed major depressive disorder, recurrent episode, mild; attention deficit disorder; gender dysphoria; Addison's disease; idiopathic hypersomnia; and vitiligo.  (Tr. 1692-1693.)

On February 22, 2016, Frost presented to Babak Tousi, M.D., for evaluation of memory decline.  (Tr. 1554-1558.)  He reported his memory concerns started "about a year ago and became more noticeable" when he started taking medication for Addison's disease.  (Tr. 1554.) Frost reported the following specific symptoms: (1) unable to spell words; (2) forgets what he was going to say; (3) processes information slowly (e.g., "was unable to put a resume and cover letter together"); (4) harder to follow steps (e.g., "can't follow a recipe"); (5) easily overwhelmed by tasks; and (6) forgets people's names.  (*Id.*)  He did, however, indicate that he could manage his own finances, and perform his activities of daily living independently.  (Tr. 1554-1555.)  On examination, Dr. Tousi found good abstract thinking and good long term memory.  (Tr. 1557.) He noted Frost's "cognition and especially his delayed recall was within normal [limits] in spite

11

of his concern about memory loss." (*Id.*)  Dr. Tousi did not find any neurological deficit, but found "there was noticeable component of anxiety in his presentation and report of symptoms." (*Id*.)  Dr. Tousi recommended exercise.  (*Id*.)

Frost returned to Dr. Weiss in February and March 2016.  (Tr. 1270-1271.)  On both visits, his attention, memory, and thought processes were "okay," but his insight was described as "impaired" and "minimal." (*Id*.)  In his narrative discussion of Frost's mental status, Dr. Weiss indicated as follows: "Unclear, informal, obsessive preoccupations and manipulative and wandering personality style."  (Tr. 1270.)  He indicated a lack of certainty as to next steps, but prescribed Adderall.  (*Id*.)

The record reflects Frost presented to therapist Eric Main at Signature Health on three occasions in April 2016.  (Tr. 1250-1264.)  At these visits, Frost presented with fair to good hygiene, good eye contact, and normal speech.  (*Id*.)  He also, however, showed constricted affect and evasive behavior.  (Tr. 1256, 1261.)  During these visits, Frost was unable to describe the symptoms he was currently experiencing or articulate what he wanted to achieve by attending counseling.  (Tr. 1254, 1264.)  At the first visit, he expressed anger at a professor who he believed had graded him unjustly, noting "it should have been known that this level of work would be traumatic on him."  (Tr. 1254.)  At the second visit, he was angry at Mr. Main because he was not satisfied with the previous session.  (Tr. 1259.)  Mr. Main noted that "clear boundary definition will be a need within therapy sessions."  (*Id*.)  At the final visit, Frost appeared with a stuffed animal, as well as multiple wrists bands with medical warning insignias about his various medical conditions.  (Tr. 1264.)  Mr. Main diagnosed major depressive disorder, recurrent, moderate; generalized anxiety disorder; and unspecified personality disorder; and assessed a

GAF of 55, indicating moderate symptoms.  (Tr. 1250, 1255, 1260.)

On April 19, 2016, Frost presented to psychiatrist Thomas Svete, M.D.  (Tr. 1236-1241.) On examination, Dr. Svete noted Frost was mildly anxious, "very distractible," with an "overinclusive productive" thought process, fair memory, and fair judgment and insight.  (Tr. 1238-1239.)  He also noted Frost "tends to attempt to control the interview," "frequently interrupts," and "is difficult to interrupt."  (Tr. 1238.)  Dr. Svete diagnosed mood disorder, possible generalized anxiety disorder, and mixed personality disorder with borderline traits.  (Tr. 1241.)  He indicated he was "not sure" that Frost met the criteria for ADHD, and refused to prescribe Adderall.  (*Id.*)  Dr. Svete noted "we are not in agreement with the treatment plan" and suggested Frost seek a second opinion.  (*Id.*)  Shortly thereafter, Frost presented to a nurse practitioner, who agreed to prescribe Adderall.  (Tr. 1242-1248.)

Frost then transferred care to MetroHealth, where he underwent several mental health assessments in May 2016.  (Tr. 2021-2032, 1265-1269, 2035-2041.)  He reported various symptoms, including loss of energy and motivation, difficulty concentrating, social isolation, sleep difficulty, anxiety, feelings of worthlessness and helplessness, obsessive behaviors (including binge spending), distractibility, and increased irritability.  (Tr. 2022-2024, 2035-2036.) Frost also complained of auditory and visual hallucinations.  (Tr. 2024, 2036.) Specifically, he reported hearing sounds "that he cannot tell if they are real or not," including muffled voices and television noises.  (*Id.*)  Frost also reported feeling paranoid and delusional, stating "while working with his doctor he became stuck in the mind of a 6 year old (his inner child)" and "had issues" returning to the present.  (*Id.*)  Mental status examination findings were largely normal, aside from anxious behavior and depressed/anxious/dysphoric mood.  (Tr. 2029,

13

2039.)  He was diagnosed with generalized anxiety disorder; major depressive disorder, recurrent, moderate; posttraumatic stress disorder; paranoia; and rule out ADHD, inattentive type.  (Tr. 2029, 2040.)

Frost then transferred care again, this time to Ravenwood Health.  He met with licensed professional clinical counselors David Hughes, LPCC, and Lori Wolfe, LPCC, on multiple occasions between June and September 2016.  (Tr. 1609-1650)  He complained of overwhelming anxiety.  (Tr. 1609, 1618.)  On June 27, 2016, he had a euthymic mood with cooperative behavior, full affect, and logical thought process.  (Tr. 1614.)  On July 5, 2016, he was anxious but cooperative with logical thought process.  (Tr. 1619.)  Thereafter, treatment records generally described him as cooperative with a stable or anxious mood.  (Tr. 1625, 1628, 1631, 1634, 1637, 1640, 1643, 1646, 1649.)  Ms. Wolfe noted Frost brought a stuffed animal to at least one of his therapy sessions.  (Tr. 1632.)  She noted working with him on "monitoring his symptoms in a healthy way versus becoming very preoccupied with the fear."  (Tr. 1638.)  Ms. Wolfe also discussed with him his "general mistrust of treatment providers" and "pattern of disappointment of treatment providers and how this may be related to his difficulty with trust."  (Tr. 1641, 1650.)

On August 22, 2016, Frost presented to psychiatrist Howard Gottesman, M.D.  (Tr. 2082-2086.)  Dr. Gottesman noted Frost's many complaints about his various treatment providers, finding his speech was "quite circumstantial" and remarking that Frost was "very angry."  (Tr. 2084.)  On examination, he noted Frost was well-groomed with cooperative behavior, normal speech, logical and organized thought process, no evidence of paranoia, no evidence of perceptual disturbance, euthymic mood, full affect, sustained attention/concentration, normal memory, and good judgment and insight.  (Tr. 2085.)  Dr. Gottesman further noted as follows:

"[Frost] has doctor shopped and internet preoccupied, looking of r a [diagnosis] and a disability, thinks no doctor knew what he has, makes his own [diagnosis], argues with me because he has his own definition of psychosis." (Tr. 2084.)  He diagnosed dysthymia, and prescribed Effexor.[10] (Tr. 2085.)

On November 22, 2016, Frost presented to social worker Lisa Miller, LISW-LPCC, for a diagnostic assessment.  (Tr. 1325-1330.)  He complained of anxiety and occasional depression. (Tr. 1325.)  Frost also stated he has cognitive delays that he believed were related to his diagnosis of adrenal insufficiency.  (Tr. 1327.) Ms. Miller diagnosed ADHD and generalized anxiety disorder.  (Tr. 1328.)

On November 21, 2016, Frost established treatment with psychiatrist Jeffrey Turell, M.D. (Tr. 1331-1335.)  Mental status examination findings were largely normal, aside from circumstantial thought process and a notation that Frost was "a little down."  (Tr. 1333.)  Dr. Turell also noted Frost's insight was "somewhat limited" and his judgment was "variable."  (*Id*.) He diagnosed major depressive disorder, recurrent, partial remission; PTSD; ADHD; and anxiety disorder; and assessed a GAF of 45, indicating serious symptoms.  (*Id*.)  Dr. Turell noted Frost

---

[10] The record reflects Frost presented regularly to counselor trainee Anne Hayman between September and December 2016.  (Tr. 1905-1957.)  He presented with "symptoms of anxiety and impulsivity as evidenced by difficulty interacting with figures of authority, sustaining employment, managing resources, and coping with stress related to health issues."  (Tr. 1936.)  Frost also reported difficulty concentrating and sleeping "due to ruminating thoughts."  (*Id*.)  He indicated he would like to work but is overwhelmed by a "wall of anxiety" when is in the application process.  (Tr. 1939.) Frost described his mind as "pinging off the walls" with "lots of mind activities and ideas," and complained of memory problems and "cognitive issues." (Tr. 1946.)  Mental examination findings included obsessional thought content, demanding behavior, tangential thought process, and anxious mood.  (Tr. 1950-1952.)  Ms. Hayman noted Frost "presents with excessive and persistent daily worry that have little factual or logical basis."  (Tr. 1928.)

"would like to return to work but not sure in what capacity and how he will handle the stress at work." (*Id*.)  He increased Frost's Effexor dosage, and prescribed Deplin.  (Tr. 1334.)

Meanwhile, Frost presented to Dr. Wolf on seven (7) occasions between April and December 2016.  (Tr. 1730-1736.)  In April, he was "very anxious" about his "adrenal problems" and how they were affecting his mood.  (Tr. 1736.)  In May, Frost complained of increased depression and anxiety, as well as feelings of isolation, paranoia, and fear.  (Tr. 1735, 1734.)  He continued to report conflicts and disappointments with several of his treatment providers during this time period.  (Tr. 1733, 1736, 1731.)  In August, Frost reported that he had started a partial hospitalization program, at which he was "very stressed by the group, overwhelmed with the amount of noise, and feeling intruded on by another member's service dog."  (Tr. 1732.)  In September, Dr. Wolf noted that Frost "describe[d] more intense feelings of hopelessness and helplessness."  (Tr. 1731.)

On December 8, 2016, Dr. Wolf wrote a letter to Frost's caseworker at the Lake County Department of Job and Family Services, as follows:

> Mr. Frost suffers from severe anxiety, and in spite of his best efforts to seek employment, the stress of not only environment but even the stress of a job search has proven unmanageable for him.  For example, as a requirement to receive unemployment compensation several years ago, he was unable to tolerate the stress of participating in a program that monitors his seeking employment.  Furthermore, his attempts to take classes at a local community college was so stressful that he could not successfully complete course work because of his intense anxiety and subsequent depression.  In the past year he was diagnosed with severe endocrine problems, which has furthered his anxiety about his health.
>
> Because of his chronic psychiatric problems, he is unable to function even in a work environment that has minimal expectations.  This is in spite of his best efforts in the past to seek employment and participate in education programs.  He states that he no longer wants to participate in the Lake County Food Assistance and Employment Program because it will be detrimental to both his physical and psychological health.  Given my long history of treating Mr. Frost, I recommend that he be excused from

16

participating in employment rehabilitation programs.

(Tr. 1719.)[11]

On January 3, 2017, Frost presented to the ER with complaints of auditory hallucinations. (Tr. 1808-1844.)  He reported hearing "voices coming out of the walls" and "constant talking." (Tr. 1817.)  Frost further described his hallucination as "conversations happening in the distance along with hearing music and marching bands," and noted "today he heard voices coming out of the dryer."  (*Id*.)  He also complained of visual hallucinations including "a flashing disco ball and waves in the air."  (*Id*.)  Treatment records indicate Frost presented as anxious with rambling speech, restlessness, limited insight, and poor judgment.  (Tr. 1817, 1818.)  The ER physician considered the possibility of admitting Frost but "no immediately available placement has been able to be identified." (Tr. 1844.)  As Frost was not suicidal, the ER physician determined he was "potentially stable for outpatient treatment" and discharged him with a prescription for Ambien. (*Id*.)

Frost presented to Dr. Turell the following day.  (Tr. 1753.)  He reported hearing voices while doing the laundry, and complained of increased anxiety, poor sleep, and decreased appetite.  (*Id*.)  On examination, Dr. Turell noted cooperative behavior, circumstantial speech, fluent speech with increased output, partial insight, and poor judgment.  (Tr. 1754-1755.)  He remarked that Frost was reporting "significant distress" over his hallucinations, and diagnosed major depressive disorder, recurrent, with psychosis.  (Tr. 1756-1757.)  Dr. Turell described Frost as "markedly ill."  (Tr. 1757.)  He continued him on his Effexor and prescribed Rexulti.

---

[11] In addition, throughout 2016, Dr. Murphy found Frost's adrenal insufficiency was "well compensated," and that he was "clinically and chemically euthyroid with less fatigue."  (Tr. 2000, 2048, 2115.)

17

(*Id.*)

Shortly thereafter, Frost returned to Dr. Wolf and requested a letter describing his limitations in taking course work to become a phlebotomist.  (Tr. 2143.)  Frost indicated his new medication, Rexulti, was helping him with his concentration, but complained he was nonetheless experiencing challenges in completing quizzes and assignments.  (*Id.*)  Dr. Wolf wrote a letter, in which he stated that Frost's "vulnerability to acute episodes of anxiety will interfere with his ability to function effectively in an educational environment."  (Tr. 2142.)  He recommended Frost be provided with a distraction-free environment for testing.  (*Id.*)

Frost returned to Dr. Turell on February 1, 2017.  (Tr. 1750-1752.)  He stated he was "feeling good" and reported his medication was helping him.  (Tr. 1750.)  Frost reported, however, that he had recently gone on a spending spree in which he bought 80 stuffed animals.  (*Id.*)  He also continued to report auditory hallucinations.  (*Id.*)  On examination, Dr. Turell noted circumstantial thought process, grandiosity, normal speech, cooperative behavior, fair insight, and inconsistent judgment.  (*Id.*)  He described Frost as "moderately ill" and concluded his "spending [was] either a function of OCD or hypomania."  (Tr. 1752.)  Dr. Turell continued Frost on his medications.  (*Id.*)

The record reflects Frost participated in a five day partial hospitalization program ("PHP") at Laurelwood Center for Behavioral Medicine, beginning February 22, 2017.  (Tr. 2139-2140.)  Mental status examination findings included fair eye contact, anxious mood, full affect, normal speech, goal directed thought process, grossly intact memory, normal attention and concentraiton, and fair judgment and insight.  (*Id.*)  He was diagnosed with major depressive disorder, recurrent, moderate severity; and ADHD.  (Tr. 2140.)  The parties do not direct this

Court's attention to any further medical records regarding Frost's care and treatment during the PHP.

On February 28, 2017, Frost returned to Dr. Turell.  (Tr. 1747-1749.)  He denied a depressed mood, but complained of ongoing anxiety relating to his school work.  (Tr. 1747.)  On examination, Frost was alert and oriented with cooperative behavior, an "allright" mood, an upbeat affect, and circumstantial thought process.  (*Id*.)  Dr. Turell described him as moderately ill, and adjusted his medications.  (Tr. 1748.)

Frost presented to Dr. Wolf on March 17, 2017.  (Tr. 2144.)  He reported he was currently enrolled in an intensive outpatient program ("IOP") at Laurelwood, which he was attending three times per week for three hours a night for the next several weeks.  (*Id*.)  Frost reported variable sleep, indicating on some days he slept as much as 14 hours per day.  (*Id*.)  Dr. Wolf assessed major depressive disorder, recurrent, moderate; and generalized anxiety disorder.  (*Id*.)

On March 28, 2017, Frost presented to Dr. Turell.  (Tr. 1742-1744.)  He reported he had withdrawn from the phlebotomy program at school, stating the program director expressed concerns if Frost were to freeze up when he gets overwhelmed.  (Tr. 1742.)  Frost also continued to report auditory hallucinations, including music and "voices in the walls."  (Tr. 1743.)  On examination, Dr. Turell noted fair grooming and hygiene, cooperative behavior, a "kinda down" mood, circumstantial thought process, grossly intact cognition and memory, good insight, and poor judgment.  (Tr. 1742-1743.)  Dr. Turell again adjusted Frost's medications.  (Tr. 1744.)

On April 28, 2017, Dr. Turell completed an Off Task/Absenteeism Questionnaire.  (Tr. 1960.)  He opined Frost would likely be (1) off task at least 20% of the workday; and (2) absent from work about four times per month as a result of his impairments or treatment.  (*Id*.)  Dr.

19

Turell indicated Frost was likely to be off task because of his underlying impairments, which he identified as follows: "Anxiety in the moment. Has generalized anxiety disorder. Also reports difficulty concentrating." (*Id.*) He further noted Frost's off task behavior was caused by his inability to concentrate, noting Frost had been diagnosed with ADHD and reported becoming unfocused after 20 minutes of working. (*Id.*) Finally, Dr. Turell indicated Frost's off task behavior was also attributable to drowsiness. (*Id.*) In this regard, Dr. Turell indicated Frost's idiopathic hypersomnia and adrenal insufficiency contributed to drowsiness and, further, that his medications "cause him to sleep more." (*Id.*)

On May 1, 2017, Dr. Wolf completed an Off Task/Absenteeism Questionnaire. (Tr. 1975.) Like Dr. Turell, Dr. Wolf opined Frost would likely be (1) off task at least 20% of the workday; and (2) absent from work about four times per month as a result of his impairments or treatment. (*Id.*) Dr. Wolf indicated Frost was likely to be off task because of his underlying impairments, which he identified as follows: "anxiety and depression." (*Id.*) He further noted Frost's off task behavior was caused by his inability to concentrate, noting Frost was "very easily distracted." (*Id.*) Finally, Dr. Wolf indicated Frost's off task behavior was also attributable to drowsiness, noting "depression may result in excessive sleep." (*Id.*)

## C. State Agency Reports

### 1. Mental Impairments

On August 4, 2015, state agency psychologist Tonnie Hoyle, Psy.D., reviewed Frost's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 105, 106-108.) In the PRT, Dr. Hoyle found Frost had moderate restrictions in his activities of daily living, maintaining social functioning,

and maintaining concentration, persistence, or pace.  (Tr. 105.)  In the Mental RFC Assessment, she concluded Frost was moderately limited in his abilities to: (1) maintain attention and concentration for extended periods; (2) work in coordination with or in proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 107-108.)  In the narrative sections of the Assessment, Dr. Hoyle explained that Frost could complete simple and multi-step work tasks in an environment without strict production quotas.  (Tr. 107.)  She further found Frost could not work in direct contact with the general public and was capable of only simple, superficial interaction with coworkers and supervisors.  (Tr. 108.)

On December 17, 2015, state agency psychologist Cynthia Waggoner, Psy.D., reviewed Frost's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 92, 93-95.)  In the PRT, Dr. Waggoner found Frost had mild restrictions in his activities of daily living, and moderate restrictions in maintaining social functioning and maintaining concentration, persistence, or pace.  (Tr. 92.)  Dr. Waggoner affirmed Dr. Hoyle's Mental RFC Assessment. (Tr. 93-95.)

### 2. Physical Impairments

On August 1, 2015, state agency physician Sreenivas Venkatachala, M.D., reviewed

21

Frost's medical records and determined he did not suffer from a severe physical impairment.  (Tr.

104.)  On November 10, 2015, state agency physician Stephen Sutherland, M.D., reviewed

Frost's medical records and reached the same conclusion.  (Tr. 90-91.)

**D.    Hearing Testimony**

During the May 9, 2017 hearing, Frost testified to the following:

- He attended a technical school for carpentry, attended some community college classes, and later obtained a B.A. from Ohio Westland University.  (Tr. 44, 46.) He was also in the Marine Corps.  (Tr. 46.)

- He has not worked since June 2014.  (Tr. 41.)  From May 2010 to June 2014, he held a part-time position as a seafood clerk at a grocery store.  (*Id*.)  In this position, he lifted between 30 and 40 pounds, and was on his feet throughout the work day.  (Tr. 41-42.)  Prior to that, he worked for 20 years as a field technician for a phone company.  (Tr. 42-43.)  In this position, he lifted 80 to 90 pounds. (*Id*.)

- He left his position at the grocery store because of stress, stating "I knew I wasn't up to the demands of the job."  (Tr. 42.)  He took a buy out at the phone company, in part, because of "emotional stressors."  (Tr. 44.)  He incurred harassment as a result of being transgender, including battles over payment for gender-related surgery and "restroom issues."  (Tr. 44-45.)  In addition, he "constantly" had problems with authority figures.  (Tr. 49.) After leaving the phone company, he attended classes at a community college to become a respiratory therapist.  (Tr. 63-64.)  He was bullied by the teachers, causing him to seek help from the school psychologist.  (*Id*.)

- The main things that are keeping him from working are stress and sleep problems.  (Tr. 47.)  With regard to his stress, he was diagnosed in 1989 with PTSD.  (Tr. 48.)  He experienced a flare-up of his PTSD while at community college, causing him to be "on edge all the time."  (Tr. 49.)  His PTSD also causes him to have difficulty getting along with authority figures.  (*Id*.)  He did not get along with his teachers at community college, and had problems with one of his managers at the grocery store.  (Tr. 49, 64.)

- When he is stressed, he is "not able to remember to do the things I need to do." (Tr. 62.)  He has had a mental breakdown and a psychotic episode, during which he became paranoid and suicidal.  (Tr. 50, 65.)  He takes medication (including an anti-psychotic) and sees a psychiatrist.  (Tr. 50-51, 66-67.)  He has also participated in an Intensive Outpatient Program, during which he received

mental health treatment 3 days per week for three hours a day, for six weeks. (Tr. 51-52.)

- In terms of his sleep issues, he has been diagnosed with a rare condition called idiopathic hypersomnia.  (Tr. 46.)  It causes him to sleep excessively, sometimes 14 to 18 hours per day.  (*Id*.)  He never knows when his hypersomnia is going to flare up.  (Tr. 52.)  He generally experiences a flare up of this condition three to four times per year.  (Tr. 53.)  He is not currently taking medication for his idiopathic hypersomnia.  (Tr. 52.)

- He also suffers from adrenal insufficiency, tinnitus, and vitiligo.  (Tr. 47, 56, 58.)  His adrenal insufficiency causes him to struggle cognitively, particularly with remembering names and faces.  (Tr. 48.)  He has tinnitus in both ears and sometimes hears voices in the walls.  (Tr. 56.)  Because of his vitiligo, he must avoid direct sunlight.  (Tr. 58-59.)  When outside, he wears protective gloves and a sun hat.  (Tr. 59-60.)

- He lives alone in a condo.  (Tr. 55.)  He typically wakes up around noon or 1:00 p.m., goes to the store, and tries to exercise.  (Tr. 55-56.)  He prepares two simple meals for himself each day, and goes to bed by 11:00 p.m.  (*Id*.)  He is able to care of himself, in terms of his hygiene, grooming, and meals.  (Tr. 57-58.)  He has a valid driver's license.  (*Id*.)  Sometimes he goes for a bike ride for an hour and a half, but it takes him a day and a half to recover.  (Tr. 56.)

- His hobbies include reading and art therapy.  (Tr. 56.)  Art therapy helped him "get his concentration back."  (*Id*.)  However, he still cannot read the newspaper or watch television because he gets "jumpy" after 20 minutes.  (*Id*.)  He likes to read materials about schizophrenia and medicine, and also enjoys fiction.  (Tr. 68.)  After he reads something, he completely forgets about it.  (Tr. 69.)

- He leads support groups at the National Alliance for Mental Illness.  (Tr. 67.)  He used to work in the office for that organization, but he had a disagreement with the executive director.  (Tr. 68.)  He has a few friends, and helps his 92 year old stepmother with grocery shopping and errands.  (Tr. 67.)

The VE testified Frost had past work as a cable technician (light but may have performed some duties at heavy, SVP7) and food clerk (light, SVP 3).  (Tr. 71.)  The ALJ then posed the following hypothetical question:

At this time, sir, I'd ask you to assume a hypothetical individual with the past jobs that you just described. I'd further ask you to assume the hypothetical individual is limited to the following.  The hypothetical individual would fall within the

exertional category of medium, with the following further restrictions.  The hypothetical individual would be limited insofar as they would never be required to climb ladders, scaffolds or ropes, would be restricted insofar as they would be restricted from hazards such as heights or machinery, but, would be able to avoid ordinary hazards in a workplace such as boxes on the floor, doors ajar, approaching people or vehicles.  The hypothetical individual would be limited insofar as they would never be required to be exposed to atmospheric conditions such as, like, working outdoors.

(Tr. 72-73.)

The VE testified the hypothetical individual would be able to perform Frost's past work as a food clerk, but would not be able to perform his past work as a cable technician.  (Tr. 73.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as hand packager (medium, SVP 2), dishwasher (medium, SVP 2), and housekeeping, cleaner (light, SVP 2).  (*Id.*)

The ALJ then posed a second hypothetical that was the same as the first, but with the additional limitations that the hypothetical individual would be limited to simple, routine, and repetitive tasks.  (Tr. 74.)  The VE testified the hypothetical individual would not be able to perform Frost's past work (either as a cable technician or a food clerk), but would be able to perform the hand packager, dishwasher, and housekeeping, cleaner jobs.  (*Id.*)

The ALJ then posed a third hypothetical that was the same as the first but with the exertional category of light work.  (*Id.*)  The VE testified the hypothetical individual would be able to perform Frost's past work as a food clerk, in addition to the housekeeping, cleaner job and the job of mail clerk (light, SVP 2).  (Tr. 74-75.)

The ALJ then asked as follows:

Okay.  For the next hypothetical, the hypothetical individual would -- okay.  If you were to add to any of the -- or all of the hypotheticals the following further restriction, that the hypothetical individual would, due to ongoing fatigue, would find

24

themselves to be off task 20% in a given workday, would such an individual be able to perform any of the past work or sample jobs offered in response to the earlier hypotheticals?

(Tr. 75.)  The VE testified there would be no work for such an individual.  (Tr. 76.)

Frost's attorney then asked about employer tolerance for absenteeism.  (*Id*.)  The VE testified that "if somebody misses two days or more a month on an ongoing basis, that would exclude all work."  (*Id*.)  Finally, Frost's attorney asked the VE as follows: "if we have the individual in Hypothetical #1, except it's at light work and there is a limitation to simple, repetitive and routine tasks, would that preclude performance of the Seafood Clerk job?"  (*Id*.) The VE testified that it would.  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial

gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Frost was insured on his alleged disability onset date, June 2, 2014, and remains insured through September 30, 2019, his date last insured ("DLI.")  (Tr. 13.)  Therefore, in order to be entitled to POD and DIB, Frost must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ  made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2019.

2.  The claimant has not engaged in substantial gainful activity since June 2, 2014, the alleged onset date (20 CFR 404.1571 et seq.)

3.  The claimant has the following severe impairments: hypothyroidism, generalized anxiety disorder, depression, anxiety with h/o attention deficit disorder (ADD), history of idiopathic hypersomnia, and vitiligo (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant can never climb ladders, ropes or scaffolds. Restricted from hazards such as heights or machinery but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles; work would be primarily indoors, Limited to simple tasks; limited to routine and repetitive tasks.

6.  The claimant is capable of performing past relevant work as a food [sic]. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from June 2, 2014, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 13-25.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Treating Physicians Drs. Turell and Wolf*

In his first assignment of error, Frost argues remand is required because the ALJ failed to articulate "good reasons" for rejecting the opinions of Drs. Turell and Wolf that Frost would be off task at least 20% of the workday and absent four or more days per month due to his impairments or treatment.  (Doc. No. 11 at 8-11.)  Specifically, he maintains that, in rejecting these opinions, the ALJ mischaracterized the evidence, failed to properly characterize the nature of the conditions for which Dr. Turell treated him, and improperly found Dr. Wolf's opinion was speculative.  (*Id*.)

The Commissioner argues remand is not required because the portions of these physicians' opinions about absenteeism do not constitute "medical opinions" for purposes of social security regulations.  (Doc. No. 13 at 13.)  She further maintains the ALJ's assessment of the opinions of Drs. Turell and Wolf are supported by "a multitude of good reasons," including that the opinions "contained no underlying rationale" and conflicted with other evidence of record.  (*Id*. at 15.)   The Commissioner also asserts the ALJ properly rejected Dr. Wolf's opinion as vague and unsupported.[12]  (*Id*. at 17.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[13]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[14]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors

---

[12] The Commissioner argues, at length, that "the ALJ reasonably determined Plaintiff's RFC."  (Doc. No. 13 at 10-12.)  This is curious as Frost does not argue that the RFC in this matter is not supported by substantial evidence.  As Frost does not raise this issue as an assignment of error, the Court will not address it herein.

[13] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).  As Frost's application was filed in March 2015, the Court will apply the regulations in effect at that time.

[14]  SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298 at *1.

provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[15]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and

---

[15] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The Court will address the ALJ's evaluation of the opinions of Drs. Turell and Wolf separately, below.

*Dr. Turell*

As noted *supra,* Dr. Turell completed an Off Task/Absenteeism Questionnaire on April 28, 2017.  (Tr. 1960.)  He opined Frost would likely be (1) off task at least 20% of the workday; and (2) absent from work about four times per month as a result of his impairments or treatment. (*Id*.)  Dr. Turell indicated Frost was likely to be off task because of his underlying impairments, which he identified as follows: "Anxiety in the moment.  Has generalized anxiety disorder.  Also reports difficulty concentrating."  (*Id*.)  He further emphasized Frost's off task behavior was caused by his inability to concentrate, noting Frost had been diagnosed with ADHD and reported becoming unfocused after 20 minutes of working.  (*Id*.)  Finally, Dr. Turell indicated Frost's off task behavior was also attributable to drowsiness.  (*Id*.)  In this regard, Dr. Turell indicated Frost's idiopathic hypersomnia and adrenal insufficiency contributed to drowsiness and, further, that his medications "cause him to sleep more." (*Id*.)

The ALJ accorded Dr. Turell's opinion "little weight," explaining as follows:

> At Exhibit 52F, dated April 28, 2017, Dr. Jeffrey Truell [sic] opines that the claimant will miss work about 4 times per month due to fatigue, adrenal insufficiency, and idiopathic hypersomnia.  Little weight is given this opinion.  As noted, the claimant's endocrinologist, Dr. Murphy, reports the adrenal insufficiency is well compensated (Ex. 56F page 6).  As also noted, the claimant does not medicate for his idiopathic hypersomnia, and he testified he as episodes of this impairment only three-four times per year. As to fatigue, Dr. Murphy also reported the claimant's thyroid functions normally with replacement therapy (Ex. 56F page15, 24, and 72).

(Tr. 23.)  The ALJ included the following mental limitations in the RFC: "Limited to simple tasks; limited to routine and repetitive tasks."  (Tr. 21.)

It is recommended the Court find the ALJ failed to articulate "good reasons" for rejecting Dr. Turell's opinion.  Indeed, the Court finds the ALJ's evaluation of this opinion is flawed in multiple respects.  First, the ALJ fails entirely to acknowledge or address, at any point

33

in the decision, Dr. Turell's opinion that Frost would be off task at least 20% of the workday, instead limiting his discussion to Dr. Turell's opinion regarding absences.  (Tr. 1960.)  This is problematic because, as Frost correctly notes, the VE expressly testified there would be no work for an individual that is off task 20% of the workday.  (Tr. 75-76.)

Second, the ALJ mischaracterizes Dr. Turell's opinion.  The ALJ states that the basis of Dr. Turell's opinion is that Frost "will miss work about 4 times per month due to fatigue, adrenal insufficiency, and idiopathic hypersomnia."  (Tr. 23.)  The ALJ fails, however, to acknowledge that Dr. Turell offered several additional, specific bases for his opinion regarding Frost's off task behavior and absenteeism.  The Questionnaire completed by Dr. Turell asked him to identify "the reasons why your patient is likely to be off task."  (Tr. 1960.)  Dr. Turell provided four separate reasons.  The first was Frost's underlying impairments, which Dr. Turell identified as "anxiety in the moment," generalized anxiety disorder, and difficulty concentrating.  (*Id*.)  The second reason identified by Dr. Turell was "inability to concentrate, pay attention, and/or focus on a sustained basis."  (*Id*.)  In this regard, Dr. Turell explained that Frost has been diagnosed with ADHD and "reports [he] would become unfocused after 20 minutes of working."  (*Id*.)  Third, Dr. Turell cites medication side effects as a reason for his opinion, noting Frost's medications "cause him to sleep more."  (*Id*.)  Finally, Dr. Turell identifies drowsiness as a basis for his opinion, noting Frost's idiopathic hypersomnia and adrenal insufficiency "contribute to" his drowsiness.  (*Id*.)

Here, the ALJ focuses exclusively on the last of these reasons, while failing entirely to acknowledge or address the multiple other reasons provided by Dr. Turell for his opinion.  This is particularly problematic given the ALJ's failure to acknowledge or discuss, at any point in the decision, the nature of Dr. Turell's treatment relationship with Frost.  Indeed, the ALJ does not

discuss *any* of Dr. Turell's treatment notes in the decision.  Nor does he acknowledge or appear to recognize that Dr. Turell was Frost's psychiatrist and treated him for his mental (as opposed to physical) impairments, including his generalized anxiety disorder, major depressive disorder, PTSD, and ADHD.

The ALJ's failure to do so is troubling in light of the fact that there is evidence in the medical record that is potentially consistent with Dr. Turell's opinion, including Dr. Turell's own treatment records.  Specifically, and as set forth *supra*, Dr. Turell examined Frost on five occasions between November 2016 and April 2017.  (Tr. 1331-1334, 1753-1757, 1750-1752, 1747-1749, 1742-1744.)  During each visit, he noted findings that are potentially consistent with his opinion of off task behavior, including notations of circumstantial thought process and auditory hallucinations.  (*Id.*)  In addition, it is noteworthy that Dr. Turell diagnosed ADHD and major depressive disorder with psychotic features, and on at least one occasion described Frost as "markedly ill."  (Tr. 1333, 1757.)  Moreover, Frost's other treatment providers also noted findings potentially consistent with Dr. Turell's opinion of off task behavior and absenteeism.  For example, in late 2015, Dr. Swales noted Frost's "clinical profile . . . suggests a person with significant thinking and concentration problems."  (Tr. 1798.)  He further found Frost's "thought processes are likely to be marked by confusion, distractibility, and difficulty concentration [sic], and he may experience his thoughts as being somewhat blocked or disrupted."  (Tr. 1799.)  Several of Frost's providers noted examination findings consistent with Dr. Swales' conclusions.  In November 2015, Dr. Wolf noted Frost showed a "loose" stream of thought "with associations that he cannot explain."  (Tr. 1195.)  In March 2016, Dr. Weiss summarized Frost's mental status as "unclear" with "obsessive preoccupations" and "wandering personality style."  (Tr. 1270.)

35

The following month, Dr. Svete found Frost was "very distractible."  (Tr. 1238.)  In August 2016, Dr. Gottesman noted Frost had a "quite circumstantial thought process."  (Tr. 2084.) Finally, the record reflects Frost frequently complained of auditory hallucinations between May 2016 and March 2017. [16]  (Tr. 2024, 2036, 1817, 1753, 1750, 1743.)

The ALJ does not discuss the above evidence at any point in the decision, rendering it unclear whether he considered it in the context of evaluating Dr. Turell's opinion.  Indeed, the fact that the ALJ does not acknowledge this evidence, the nature of Dr. Turell's treating relationship with Frost, or Dr. Turell's specific opinion regarding off task behavior, causes the Court to have some concern that the ALJ did not, in fact, consider this evidence.  Accordingly, and for all the reasons set forth above, the Court finds the ALJ erred in his analysis of Dr. Turell's April 2017 opinion.

The Commissioner argues remand is nonetheless not required because Dr. Turell's opinion that Frost would likely miss four or more days of work every month as a result of his impairments or treatment, does not constitute a "medical opinion" for purposes of social security regulations.  (Doc. No. 13 at 13.)  Citing several unreported cases, she argues this portion of his opinion (and the corresponding portion of Dr. Wolf's opinion) "are non-medical opinions on issues reserved to the Commissioner, and are therefore entitled to no special significance."  (*Id.*)

The Court need not reach this issue.  As discussed above, in addition to his opinion regarding absenteeism, Dr. Turell opined Frost would be off task for at least 20% of the workday. (Tr. 1960.)  Thus, even assuming, *arguendo,* that Dr. Turell's opinion regarding absences did not

---

[16] One would imagine it would be difficult to stay on task when hearing "voices coming out of the walls," as well as "music and marching bands," as reported by Frost. (Tr. 1817-1818.)

constitute a "medical opinion," remand is nonetheless required because the ALJ failed to either acknowledge, or articulate "good reasons" for rejecting, Dr. Turell's opinion regarding Frost's off task behavior.

Accordingly, it is recommended the Court find this matter should be remanded to allow the ALJ to properly address Dr. Turell's opinion.  In so doing, it is recommended the ALJ take greater care to consider the medical evidence as a whole, including Dr. Turell's treatment notes.

### Dr. Wolf

Dr. Wolf completed an Off Task/Absenteeism Questionnaire on May 1, 2017.  (Tr. 1975.)  Like Dr. Turell, Dr. Wolf opined Frost would likely be (1) off task at least 20% of the workday; and (2) absent from work about four times per month as a result of his impairments or treatment.  (*Id*.)  Dr. Wolf indicated Frost was likely to be off task because of his underlying impairments, which he identified as follows: "anxiety and depression."  (*Id*.)  He further noted Frost's off task behavior was caused by his inability to concentrate, noting Frost was "very easily distracted."  (*Id*.)  Finally, Dr. Wolf indicated Frost's off task behavior was also attributable to drowsiness, noting "depression may result in excessive sleep."  (*Id*.)

The ALJ accorded this opinion "little weight," explaining as follows:

> Similarly, at Exhibit 55F page 2, dated May 1, 2017, Dr. Wolf opined that the claimant would miss 4 days a month of work because the "depression may result in excess sleep" (Ex. 55F page 2). Little weight is given to this opinion because it is speculative.

(Tr. 23.)

It is recommended the Court find the ALJ failed to articulate "good reasons" for rejecting Dr. Wolf's opinion.  First and foremost, and as he did with Dr. Turell's opinion, the ALJ fails entirely to acknowledge or address Dr. Wolf's opinion that Frost would be off task at

37

least 20% of the workday. (Tr. 1975.) As noted above, this cannot be deemed harmless error in light of VE testimony that there would be no work for an individual that is off task 20% of the workday. (Tr. 75-76.)

Second, the ALJ mischaracterizes Dr. Wolf's opinion. The ALJ states that the basis of Dr. Wolf's opinion is that Frost "will miss 4 days of work because the 'depression may result in excess sleep.'" (Tr. 23.) The ALJ fails, however, to acknowledge or address that Dr. Wolf expressly found Frost's off task behavior was also the result of his anxiety and inability to concentrate. (Tr. 1975.) This is problematic because, as discussed at length above, there is evidence in the record that is potentially consistent with Dr. Wolf's opinion regarding off task behavior, including findings of circumstantial thought process, hallucinations, difficulty concentrating, and distractibility. (Tr. 1195, 1798-1799, 1270, 1238, 2024, 2036, 2084, 1951.) The ALJ failed to discuss this evidence in the context of Dr. Wolf's opinion and, further, failed to discuss the majority of his treatment notes. As noted above, Frost treated regularly with Dr. Wolf for many years, seeing him over sixty (60) times between June 2014 and March 2017. (Tr. 744-767, 768-781, 1193-1213, 1730-1736, 2143-2144.) The ALJ did not acknowledge the length or depth of this treatment relationship at any point in the decision and, in fact, cited to only one of Dr. Wolf's treatment records in the decision. (Tr. 20.) While an ALJ is not required to discuss every piece of evidence in the record, it is concerning that the ALJ herein failed to acknowledge Dr. Wolf's lengthy treatment history with Frost or discuss the vast majority of his treatment records in evaluating the opinion evidence.

Accordingly, the Court finds the ALJ failed to properly evaluate Dr. Wolf's May 2017 opinion. It is, therefore, recommended the Court find this matter should be remanded to allow

the ALJ to properly address Dr. Wolf's opinion.  In so doing, it is recommended the ALJ take greater care to consider the medical evidence as a whole, including Dr. Wolf's treatment notes.

***State Agency Reviewing Psychologists Drs. Hoyle and Waggoner***

In his second assignment of error, Frost argues the ALJ failed to properly consider the opinions of State Agency psychologists Drs. Hoyle and Waggoner that Frost should be limited from strict production quotas.  (Doc. No. 11 at 12-14.)  He maintains remand is required because "the ALJ failed to explain why the limitation that work must be without strict production quotas is missing from the ALJ's RFC finding."  (*Id*. at 14.)

The Commissioner argues the ALJ properly weighed the opinions of Drs. Hoyle and Waggoner, arguing "[a]lthough the ALJ did not explicitly address this quota limitation, his decision to exclude it from the RFC was supported by a multitude of factual findings throughout his decision."  (Doc. No. 13 at 19.)

In formulating the RFC, ALJs "are not required to adopt any prior administrative medical findings [made by federal or state agency consultants], but they must consider this evidence . . . because our Federal or State agency medical and psychological consultants are highly qualified and experts in Social Security disability evaluation."  20 CFR § 404.1513a (b)(1).  When doing so, an ALJ will consider several factors "in deciding the weight we give to any medical opinion," including, the nature and duration of the relationship, the supportability and consistency of the opinion, specialization, and other factors such as "the amount of understanding of our disability programs and their evidentiary requirements that a medical source has, regardless of the source of that understanding, and the extent to which a medical source is familiar with the other information in your case record."  20 C.F.R. § 404.1527(c).  Finally, an

39

ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 CFR § 404.1527(f)(2).

On August 4, 2015, state agency psychologist Dr. Hoyle concluded (among other things) that Frost was moderately limited in his ability to maintain attention and concentration for extended periods.  (Tr. 107-108.)  Specifically, she explained that Frost could complete simple and multi-step work tasks in an environment without strict production quotas.  (Tr. 107.)  On December 17, 2015, state agency psychologist Dr. Waggoner reached the same conclusions.  (Tr. 94.)

The ALJ accorded "partial weight" to these opinions, finding as follows:

> The reviewing state agency psychologist determined that, "claimant can complete simple and multistep work tasks in an environment without strict production quotas" and "claimant should not work in direct contact with the general public, he is capable of simple, superficial interaction with coworkers and supervisors" (Ex. 1A page 16). Again, I assign only partial weight to these opinions. I agree that the claimant is limited to simple takes due to his anxiety. I find no reason to limit his interaction with others. In Ex. 26E and in his testimony, the claimant reported he shops, interacts with friends, and does volunteer work at his church.

(Tr. 22.)  As noted above, the ALJ assigned the following mental limitations in the RFC: "Limited to simple tasks; limited to routine and repetitive tasks."  (Tr. 21.)

As this matter is being remanded for further consideration of the opinions of Drs. Turell and Wolf, it is recommended the ALJ also give further consideration on remand to Dr. Hoyle's and Dr. Waggoner's opinions that Frost be limited from work with strict production quotas.  The ALJ does not acknowledge this specific opinion in the decision, nor does he provide any explanation as to why it was rejected.  Moreover, while the ALJ does selectively cite several

normal examination findings at step three, the ALJ fails to acknowledge or address (at any point in the decision) the many abnormal examination findings in the record, including findings of circumstantial thought process, distractibility, rambling speech, and hallucinations.  (Tr. 1195, 1798-1799, 1270, 1238, 2024, 2036, 2084, 1951.)  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 at * 6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that point to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 at * 4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Accordingly, it is recommended the Court find that, on remand, the ALJ should give further consideration to the opinion of Drs. Hoyle and Waggoner that Frost is limited to work without strict production quotas.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

                                          s/Jonathan D. Greenberg
                                          Jonathan D. Greenberg
                                          United States Magistrate Judge


Date: June 14, 2019


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**